## In the United States District Court
## for the District of Kansas

---

**United States of America**,
*Plaintiff*,

v.                                    Case No. 19-cr-40091-DDC

**Jarrett William Smith,**
*Defendant.*

---

## Defendant's Sentencing Memorandum

---

Jarrett William Smith asks the Court to impose a sentence of 15 months' imprisonment to be followed by three years of supervised release. Mr. Smith's individual history and characteristics, including his lack of any prior criminal record, the nature and circumstances of the offense, Mr. Smith's quick acceptance of responsibility by pleading guilty, the retributive and deterrent effects of Mr. Smith's prosecution and incarceration, and the public's interest in Mr. Smith's rehabilitation and successful reentry as a contributing member to society all support this request.

This sentencing memorandum will explain how Mr. Smith's youth—stifled by peer rejection, victimization, and isolation—fomented his yearning for acceptance, and motivated the behavior that has ended in this prosecution. It is to also provide insight into the stable and supportive life that awaits Mr. Smith in Myrtle Beach, South Carolina, upon his release, and why the sentence requested is sufficient but no greater than necessary to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

1. **Jarrett William Smith: a history of trauma.**

   *Mr. Smith's first five years: family unity and peer acceptance*

Mr. Smith was welcomed in September 1995 as the firstborn to his parents, Chris and Rebecca, who were both part-time musicians at the time, and who had met three years earlier. In welcoming their baby boy, Chris and Rebecca learned that Mr. Smith had not only inherited the recessive fire-red-hair of his ancestors (neither of Mr.



Smith's parents has red hair), but also was born with a bilateral cleft lip and palate—birth defects with unknown causes.[1] These distinguishing features would unfortunately leave not only physical scars for Mr. Smith but emotional ones, as well. The cleft lip and palate led to repeated, invasive, and painful reconstructive



surgeries from early infancy throughout his teenage years—surgeries that involved taking cartilage from one part of his body (such as his ear or hip) to reconstruct his face.[2] The birth defects and ever changing facial reconstruction concomitantly made speech therapy a necessity throughout Mr. Smith's youth.

---

[1] CDC, Facts about Cleft Lip and Cleft Palate (noting that the cause of the birth defects remains unknown), *available at* https://www.cdc.gov/ncbddd/birthdefects/cleftlip.html.

[2] *See* Letter of Rebecca Bongiorno (**Def. Ex. 504**) (discussing the "eight cranial facial surgeries" and related treatment Jarrett endured); *see also* **Def. Ex. 505** (photos filed under seal); D.E. 23 (PSR) at ¶80 (discussing the multiple surgeries Jarrett underwent "between infancy and age 15").

Despite his birth defects and painful medical procedures, Mr. Smith's strongest memories from early childhood remain those in which he felt joy and acceptance.[3] From a young age Mr. Smith found happiness through baseball. He recalls bonding



with his dad over the game—playing catch in their yard, visiting the batting cages, and spending warm summer afternoons together cheering on the Myrtle Beach Pelicans. Mr. Smith relished playing Little League, too. With all the team camaraderie and friends that the sport garnered, Mr. Smith recalls simply "being a lot happier" back then.[4]



*Little League team photos*

*(left, front row, first on the right; above, back row, second from the right)*

---

[3] Interview with Jarrett Smith, May 5, 2020.

[4] *Id.*

### *From childhood to adolescence:*
### *changes at home, peer rejection, social isolation, and depression*

As an only child until five, Mr. Smith was eager to welcome a baby sister and to become a big brother.[5] But his sister's arrival in 2001 brought many complicating changes to the life Mr. Smith had known.

At birth, his sister suffered from a congenital heart defect, which left her life declining until, at the age of six months and weighing only six pounds, she received emergency, open-heart surgery, and her health slowly began to improve.[6] In the midst of the family's consternations,



*Meeting baby sister, 2001*

five-year-old Mr. Smith took a place in the background, understanding that "there were more important things than [him] that needed to be taken care of."[7]

Not long after, the life and family unit in which Mr. Smith had felt secure and happy only continued to unravel. His parents' marriage slowly deteriorated over the next few years, leaving Mr. Smith emotionally distraught from the constant arguing and yo-yoing from his dad's residence to his mom's. By 2004, when Mr. Smith was

---

[5] Letter of Rebecca Bongiorno (**Def. Ex. 504**) (noting that at "age five, [Jarrett] consistently prayed for a little sister" and that "[h]is prayers were answered & he loves her very deeply and has always been protective over her.").

[6] Jarrett's sister has a learning disability and special needs.

[7] Interview with Jarrett Smith, May 5, 2020.

nine, his parents formally separated and divorced the following year.[8] The broken home left Mr. Smith, for the first time, feeling helpless, lost, and very alone.[9]

His parents' divorce and their volatility around this time remains a decisive moment for Mr. Smith in his youth. Mr. Smith remembers giving up on sports around this time, stating "I tried Little League one more season and I was terrible. I ended up quitting the team."[10] He also remembers losing his friends, not only from quitting team sports but also from not being able to spend time with them. His parents' vocations as self-employed musicians required that Mr. Smith and his sister spend significant time in daycare most weekends and late into the nights.

It's not surprising that his parents' divorce and its attendant circumstances coincided for Mr. Smith in an onset of new, depressive, and self-isolating behaviors. Studies demonstrate that for children and middle-schoolers in particular, not living with both biological parents reflects in an adolescent's emotional and behavioral problems, and quadruples the risk of a child having an affective disorder, one of the most common of which is depression.[11]

---

[8] D.E. 23 (PSR) at ¶75.

[9] "I couldn't understand why they were splitting up, and I didn't know anybody else going through that situation at that time." (Interview with Jarrett Smith, May 5, 2020). Notably, it was only Jarrett's immediate family that lived in Myrtle Beach. Jarrett's extended family did not live in South Carolina, and could only offer support from afar. *Id.*

[10] Interview with Jarrett Smith, May 5, 2020; *see also* D.E. 23 (PSR) at ¶76 ("Mr. Smith remembers the divorce being difficult on him and he did not participate in any activities or sports after the divorce.").

[11] Steven P. Cuffe, et. al, *Family Psychological Risk Factors in a Longitudinal Epidemiological Study of Adolescents*, Journal of American Academic Child Adolescent Psychiatry 44, 121-29 (Feb. 2005).

By sixth grade Mr. Smith's depression and social isolation had found new fuel. It was around 10 years old that Mr. Smith first remembers being made to feel different from his peers as a result of his broken home and because of his physical appearance. When he was younger, other kids were indifferent to Mr. Smith's birth defects. But by middle school, that had changed. His cleft lip (for which he continued to undergo reconstructive surgeries throughout middle school),[12] his related speech impediment,[13] and his fiery red hair made him stand out. What started as name calling and taunting turned into Mr. Smith enduring years of a near-daily barrage of "mob mentality" bullying that included both indirect (verbal/mental) assaults ("[h]e often heard phrases such as 'why don't you kill yourself,' and 'no one likes you'"[14]) and direct (physical) assaults (he recalls peers throwing rocks at him, ambushing him at the bus stop, and inviting him over to their homes only to physically attack him upon his arrival).[15]

---

[12] *See* pictures filed under seal.

[13] D.E. 23 (PSR) at ¶84.

[14] D.E. 23 (PSR) at ¶84.

[15] Interview with Jarrett Smith, May 5, 2020; *see also* Letter of Rebecca Bongiorno (**Def. Ex. 504**) (discussing Jarrett suffering "through the years with school bullies belittling him because he looked 'different,' even punching him," but that he "persevered without taking revenge on them."); Letter of Chris Smith (**Def. Ex. 506**) (discussing the deep mental and emotional wounds Jarrett sustained due to bullying by peers); Letter of Thomas Bongiorno (**Def. Ex. 507**) ("Jarrett felt like an outsider because he was bullied for his cleft lip and red hair . . . . [They] would berate him and punch him without provocation."); Letter of Michelle Gisondi (**Def. Ex. 508**) (discussing the bullying Jarrett experienced "his whole life" and how he felt "isolated, different and [] hated by many . . . . I just can't imagine the day in and day out weariness he must have felt, due to the cruelty of others.").

To add additional trauma to Mr. Smith's middle-school years was the fact that his mother, who married Mr. Smith's stepfather, Tom, in 2006, was diagnosed, and

 commenced what would be a decade-long battle, with breast cancer.[16] Throughout Mr. Smith's teenage and young-adult years, his mother's battle would require her emotional and physical absence as she would undergo multiple rounds of cancer treatments, chemotherapy, and eight surgeries.

*Jarrett's mother and stepfather's wedding ceremony, performed by long-time family friend, Pastor Ed Daniel, 2006 (Jarrett, far left)*

The victimization and peer rejection, in addition to the stress from home, had taken such force by the time Mr. Smith entered high school that the outward display of depression and the emergence of certain truant behaviors at school—like repeated tardiness[17]—is sadly predictable. The fact that Mr. Smith also started experiencing suicidal thoughts around this same time is not surprising either.[18] Being the victim of prolonged bullying by peers has been linked to increases in depression, suicide ideation, self-harm, school-related

---

[16] *See* Letter of Judy Keith (**Def. Ex. 509**) (Jarrett's mother's best friend notes that after Becca's diagnosis, "Jarrett was so worried he would lose his mother. He loved her deeply.").

[17] *See* D.E. 23 (PSR) at ¶94 ("School records indicate the defendant had excessive tardiness, which resulted in more than 20 warnings, detentions, parent conferences and in school suspensions.").

[18] Interview of Jarrett Smith, May 5, 2020.

fears/truancy, and comprised social development.[19] Mr. Smith's mother paints the following picture of her son's life at this time:

> He felt so alone, as depression set in from being rejected. Many times, after school, I'd find him alone in his room, sobbing as if he'd given up on life, so upset and in need of a friend that didn't care about the cleft [lip]. He just wanted people to accept him and to be able to fit in somewhere. His internal pain broke my heart.[20]

The emotional and behavioral issues taking root were further exacerbated by the harrowing experience of Mr. Smith learning during his freshman year that he had been on a classmate's "hit list" as an intended target of a school shooting and related plot to bomb his high school.[21] The classmate's attempt, later made known through the classmate's journal, was thwarted only after the classmate shot at and missed a high-school resource officer and was apprehended with multiple pipe bombs in his bag.[22] Mr. Smith learned later in open court that the classmate had written, "People would thank me for killing him," next to Mr. Smith's name.[23]

---

[19] Randy A. Sansone. Lori A. Sansone, *Bully Victims: Psychological and Somatic Aftermaths*, PSYCHIATRY: THE INTERFACE (June 2008) (discussing the psychological and somatic symptoms correlated to youth who bear frequent bullying), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2695751/pdf/PE_5_6_62.pdf.

[20] *See* Letter of Rebecca Bongiorno (**Def. Ex. 504**).

[21] *See* D.E. 23 (PSR) at ¶83; *see also* Nicholas Papantonis, *Soldier suspected of bomb plot once on classmate's 'hit list' in high school*, ABC 15 News (Sept. 24, 2019), *available at* https://wpde.com/news/abc15-investigates/soldier-suspected-of-bomb-plot-once-on-classmates-hit-list-in-high-school.

[22] Nicholas Papantonis, *Soldier suspected of bomb plot once on classmate's 'hit list' in high school*, ABC 15 News (Sept. 24, 2019), *available at* https://wpde.com/news/abc15-investigates/soldier-suspected-of-bomb-plot-once-on-classmates-hit-list-in-high-school.

[23] Letter of Chris Smith (**Def. Ex. 506**).

Although the classmate pleaded guilty to attempted murder and was sentenced to prison, the emotional trauma of not only having been routinely bullied over his cleft lip and speech impediment for years by peers but also being targeted for murder by a classmate added significant trauma to Mr. Smith's already deteriorating mental health and low self-



*Jarrett, 2011*

esteem—trauma that was largely suppressed and remained unresolved.[24]

Because of this harrowing incident, Mr. Smith chose to transfer to a new, neighboring high school the next year,[25] and started going by his middle name in hopes of anonymity.[26] Unfortunately the transfer did not improve Mr. Smith's situation or wellbeing. The bullying and peer rejection carried on there, too, albeit to a less extent, until his high-school graduation in 2014.

After graduation, Mr. Smith kept busy with local employment and continuing-education classes, and spent free time playing video games and finding ways to "socialize" from behind the screen. The anonymity of the interactions created a perceived safe and welcoming space in comparison to his school years. Mr. Smith also

---

[24] *See, e.g.,* Letter of Thomas Bongiorno (**Def. Ex. 507**) (noting Jarrett "was never the same" after being targeted; "He was left victimized and hurt by the continued bullying which made him cautious and somewhat untrusting of people after that traumatizing event.").

[25] D.E. 23 (PSR) at ¶93.

[26] *See* Letter of Judy Keith (**Def. Ex. 509**).

found online communities surrounding new forms of faith that he began to explore. Mr. Smith recognizes today that his loneliness and deep desire for connection and acceptance was a driving force for his retreat into the ether of online communities. And, as will be discussed below, Mr. Smith's decade of peer-rejection and yearning for inclusion made him the perfect target for online extremist groups searching for new recruits.

In 2016, at the age of 20, Mr. Smith followed his childhood dreams[27] and the legacy of family members[28] by joining the military. Mr. Smith desired to join the U.S. Army Airborne, a keen interest he had after partaking in the Youth in Cadet Program for the Civil Air Patrol as a young teen.[29] As many from Mr. Smith's support network acutely observe, they see Mr. Smith's decision to join the Army as his desire to belong and to be respected.[30]



*Jarrett at Infantry Training Graduation, 2017*

Unfortunately, Mr. Smith's desire for acceptance and inclusion did not come to fruition while in the

---

[27] *See* Letter of Rebecca Bongiorno (**Def. Ex. 504**).

[28] *See* Letter of Chris Smith (**Def. Ex. 506**) (noting that Jarrett comes from a family of military service and that Jarrett "wanted to honor them and follow in their footsteps").

[29] Letter of Rebecca Bongiorno (**Def. Ex. 504**) (noting that Jarrett won the "Best Flight" award).

[30] *See, e.g.,* Letter of Claire Zawistowski, attached (**Def. Ex. 510**) ("Jarrett was extremely proud when he joined the Army . . . . I believe Jarrett's goal was to belong and to be respected."); Letter of Pastor Al Philley, attached (**Def. Ex. 511**) ("His desire was to find the place he fit in and serve his purpose.").

Army, and especially not at Fort Riley, Kansas. Mr. Smith had a hard time bonding with other soldiers. Interviews with Mr. Smith's unit at Fort Riley, with whom he was stationed for the last few months before his arrest, provide insight not only into how others within his unit viewed and treated him, but also into Mr. Smith's psyche and his driving desire to be heard, seen, and respected by others.

For example, Mr. Smith's former Team Leader told the FBI that Mr. Smith stood out from the day he arrived "due to his cleft lip, stance that 'pushed his belly out,' and odd stories that he told everyone."[31] Likewise, Mr. Smith's former roommate at Ft. Riley stated in an interview with the FBI that he "always made it a point to avoid [Mr. Smith] . . . because he felt as though [Mr. Smith] would fabricate stories, to the point of becoming a pathological liar, to gain attention from people."[32] As numerous other statements through interviews of Mr. Smith's former coworkers elucidate, Mr. Smith was known to tell fantastical stories and to brag about his knowledge of "explosives" or "bombs" in an effort to gain attention or garner respect. In a very short time, Mr. Smith had gained a reputation among his Unit of being "a constant liar" whom nobody believed.[33] As Mr. Smith's family members observe, Mr. Smith's

---

[31] FBI Interviews of Jarrett Smith's co-workers (Sept. 25, 2019).

[32] FBI Interviews of Jarrett Smith's co-workers (Sept. 25, 2019).

[33] FBI Interviews of Jarrett Smith's co-workers (Sept. 25, 2019).

"outspoken[ness]" always seemed intimately related to his efforts to "fit-in" and be "more respected by others."[34]

And so, feeling isolated and far from home, dejected by his fellow soldiers, Mr.



*A picture Jarrett took of himself and texted to his mom on July 1, 2019, after being at Fort Riley for a little less than one month.*

Smith's untreated depression continued to rage.[35] He acknowledges today that he was turning to increasingly heavy amounts of alcohol to self-medicate during his time at Fort Riley.[36] And he also retreated to the anonymity of his online persona to seek the attention, inclusion, and respect that he so badly wanted from others in his life, but could not find. This combination of circumstances is what eventually cumulated into the regrettable choices that Mr. Smith made, which form the basis for this

prosecution. Mr. Smith accepts responsibility for these regrettable choices—the nadir of his existence.

---

[34] *See, e.g.,* Letter of Thomas Bongiorno (**Def. Ex. 507**); *see also* Letter of Jillian Smith (**Def. Ex. 512**) (stating that her older brother Jarrett is "a big talker . . . It makes him feel like he matters.").

[35] *See, e.g.,* Letter of Judy Keith (**Def. Ex. 509**) (discussing after Jarrett joined the Army, he unfortunately "found himself in a bad place with untreated depression and an innate feeling of wanting to belong.").

[36] *See* D.E. 23 (PSR) at ¶91 (Mr. Smith admitted that "[a]fter he was transferred to Fort Riley, Kansas, [] his alcohol consumption became daily. He would have to increase his intake to obtain the desired effects . . . .").

**2. Next steps: imposing a sentence sufficient but not greater than necessary to carry out the purposes of sentencing set forth by Congress.**

Mr. Smith's offenses are serious. It is the Court's duty to impose a sentence sufficient but not greater than necessary to provide just punishment for his conduct, afford adequate deterrence, protect the public from further crimes, and to provide needed rehabilitation.[37]

The United States Probation Office has calculated Jarett's guidelines offense level of 19, as follows:[38]

| | |
|---|---|
| Base offense level, § 2K1.3(a)(3) | 18 |
| Enhancement if convicted under § 842(p) | +4 |
| Acceptance of responsibility | -3 |
| Total Offense Level | 19 |

With no prior criminal history,[39] Mr. Smith's recommended guideline range is 30-37 months. But as the Court well knows, this recommended range is just "one factor among several" for the Court's consideration.[40] And the guideline range is entitled no special deference. Rather, as the Tenth Circuit has reiterated, sentencing courts "can and should engage in a holistic inquiry of the § 3553(a) factors[]" to discern the individualized sentence that is sufficient but no greater than necessary to satisfy the

---

[37] 18 U.S.C. § 3553(a)(2).

[38] D.E. 23 (PSR) at ¶¶57-66.

[39] D.E. 23 (PSR) at ¶¶68-74.

[40] *See Rita v. United States*, 551 U.S. 338, 350-51 (2007) (holding that while a properly calculated guidelines range will reflect "a rough approximation of sentences that might achieve § 3553(a)'s objectives," courts may not presume that the range does have that effect); *see also United States v. Cookson*, 922 F.3d 1079, 1093 (10th Cir. 2019) (cautioning "against excessive reliance on a single factor in sentencing").

purposes of sentencing.[41] Indeed, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[42]

### 2.1 Mr. Smith's history and characteristics, the nature and circumstances of the offense, the retributive and deterrent effects of his prosecution and incarceration, and the public's interest in his continued rehabilitation and successful reentry justify a variance in this case.

*Mr. Smith's individual history and characteristics*

For a sentence to be just, it must fit not only the crime but also the offender.[43] The Tenth Circuit has recognized that a defendant's lack of criminal history, even if also reflected in the criminal history category, is an appropriate consideration under § 3553(a) that may justify a below-guideline sentence.[44] The fact that Mr. Smith has no criminal record, including zero arrests before this case, is an appropriate consideration unique to Mr. Smith that this Court may weigh in its sentencing analysis.

At times, the government has presented Mr. Smith to be an extremist or engaged in terroristic conduct. But the FBI Behavioral Threat Assessment Center's own

---

[41] *See also Koon v. United States*, 518 U.S. 81, 113 (1996); *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008).

[42] *United States v. Gall*, 552 U.S. 38, 52 (2007).

[43] *Huckins*, 529 F.3d at 1316.

[44] *Id*. at 1318 ("After *Gall* and *Kimbrough*, "a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a)."); *see also United States v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008).

research and analysis regarding domestic terrorism demonstrates that a majority of "lone offenders"—those who carry out an act independent of any direction from a terrorist group or organization—have been arrested at least once as before carrying out their "terrorist" act.[45] More than half have been arrested more than once before the commission of the offense, and nearly 30% have previously been arrested for one or more violent offenses.[46] Moreover, the FBI's data found that of their sample "lone offenders," 83% were described by those who knew them as exhibiting "hostile, explosive, and/or aggressive behavior."[47] Mr. Smith does not fit this mold.[48]

Additionally, for Mr. Smith, his personal history and characteristics, discussed in detail above, paints a portrait of a young man who has endured substantial trauma throughout his life, most notably through the routine mental, physical, and emotional victimization by his peers. The collateral effects of this repeated trauma and victimization led to Mr. Smith's isolation, his constantly seeking attention, acceptance, and approval of others, and undoubtedly suffering from undiagnosed and

---

[45] Lauren Richards, et. al, *Lone Offender: A Study of Lone Offender Terrorism in the United States (1972-2015)*, USDOJ FBI Behavioral Analysis Unit (2019) [hereinafter *FBI Lone Offender Report*], p. 20-21 (the FBI's BTAC analyzed cases of "lone offenders" from 1972 to 2015 who attempted or completed an act of lethal violence, finding that 70% of the sample offenders had been arrested at least once as an adult before the act, and that 52% of the offenders had been arrested more than once as an adult before the act, and of those offenders with prior arrests, over half had served time in a correctional facility), *available at* https://www.fbi.gov/file-repository/lone-offender-terrorism-report-111319.pdf/view.

[46] *Id.* at 21.

[47] *Id.*

[48] Numerous letters of support document that Jarrett is not a violent, hostile, or aggressive person. *See, e.g.,* Letter of Michelle Gisondi (**Def. Ex. 508**); Letter of Judy Keith (**Def. Ex. 509**); Letter of Jillian Smith (**Def. Ex. 512**); Letter of Norris Cromer (**Def. Ex. 513**); Letter of Sarah Hawks (**Def. Ex. 514**).

unresolved chronic depression for many, many years.[49] As a mental-health therapist remarked to the media about Mr. Smith following his arrest in 2019, not addressing or resolving symptoms caused by incessant victimization is akin to "having grief that you've never really processed. So when it's never processed, it's still there, underlying, and it does affect how they function as an adult[.]"[50]

### *The nature and circumstances of the offense*

Mr. Smith's individual history and characteristics are not only crucial for understanding Mr. Smith's past but also to understanding how Mr. Smith became involved with online extremist organizations to begin with, and in understanding Mr. Smith's mindset at the time he committed these offenses.

As the FBI's 2019 Lone Offender Report points out, the process that predates an individual from becoming "radicalized" or an "extremist" varies widely, and can be highly specific to each individual based on his own personal experiences.[51] For Mr. Smith, the years of dejection, isolation, and deep desire for acceptance by others, as well as being a young, single, white, male, is critical to understanding how he was an easy target—the ideal target, rather—of the online, extremist movement.

---

[49] D.E. 23 (PSR) at ¶83 ("The defendant reports he has never been diagnosed with a mental illness, however, he believes he probably has undiagnosed depression."); *id*. at ¶91 (acknowledging that he was using alcohol to self-medicate while at Fort Riley because "he did not have any friends in the military").

[50] *See* Anjali Patel, *Local mental health therapist weighs in on how bullying might have affected Conway soldier*, ABC 15 News (Sept. 25, 2019), *available at* https://wpde.com/news/local/local-mental-health-therapist-explains-how-bullying-might-have-affected-conway-soldier.

[51] FBI Lone Offender Report, *supra*, at p. 29.

Christian Picciolini is today a well-known former extremist who had been heavily entrenched in the White Nationalist movement throughout his youth and young adulthood.[52] He has since renounced his ties to the neo-nazi movement, authored books about his experience, and founded non-profits committed to helping people dispel extremism and leave extremist organizations.[53] Mr. Picciolini provides valuable insight into how extremist organizations use "savvy recruitment" techniques to target vulnerable, marginalized youth—techniques that have become exponentially easier to deploy via the internet through online propaganda, message boards, and various social-media platforms.[54] The common denominators for the targeted individuals of these organizations is not their belief in some underlying ideology, says Mr. Picciolini. Rather, these vulnerable individuals are most often searching for "three very fundamental human needs: identity, community and a sense of purpose."[55] Mr. Smith fell squarely into that web.

Neuroscience related to the effects of social isolation and one's struggle for belonging provides keen insight into how Mr. Smith's brain operated upon acceptance into these online communities, and especially when something was specifically asked of him once there. Recent breakthroughs in neuroscience research has linked

---

[52] *See, e.g.,* Janaya Williams, Stacey Vanek Smith, *A Reformed White Nationalist Speaks Out On Charlottesville*, NPR (Aug. 13, 2017).

[53] For example, Picciolini co-founded Life After Hate: https://www.lifeafterhate.org/.

[54] *See, e.g.,* Janaya Williams, Stacey Vanek Smith, *A Reformed White Nationalist Speaks Out On Charlottesville*, NPR (Aug. 13, 2017).

[55] *Id.*

loneliness and social isolation, specifically, to a hypersensitivity in an individual's striatum—the region in the forebrain that helps enable decision-making.[56] When the striatum is starved for human connection and acceptance, it hyper-sensitizes the brain's reward system—leaving an individual ravenous for his social-neurochemistry to be rebalanced, and likely to compulsively chase a quick reward.[57] For Mr. Smith, the act of providing sought-after information to someone—that is, experience the feeling of being needed and respected for allegedly having some type of specialized knowledge—was a very quick reward for his starved striatum. And this was true regardless of the fact that the individual seeking that information from Mr. Smith was nothing more to him than an anonymous, online handle. What mattered was that Mr. Smith, in being asked to provide information to someone, felt recognized and respected among what felt like the closest thing he had ever known to a community of peers.

As discussed above, Mr. Smith had evolved over the years into a big "talker," a trait his family recognizes as collateral to his perpetual yearning to be accepted and respected by others. And as his fellow soldiers quickly recognized when Mr. Smith joined their Unit at Fort Riley in June 2019, Mr. Smith's "talking" and concomitant

---

[56] Erin Blakemore, *Neuroscientist thinks one way to fight opioid addiction is to tackle loneliness*, The Washington Post (Dec. 1 2018), *available at* https://www.washingtonpost.com/national/health-science/neuroscientist-thinks-one-way-to-fight-opioid-addiction-is-to-tackle-loneliness/2018/11/30/8f651440-f33d-11e8-80d0-f7e1948d55f4_story.html.

[57] *Id.*

desire for attention and respect coalesced into what they found to be absurd stories and unsupported statements that were quickly rebuffed as lies.

It's unsurprising then, that Jerry Taylor, a retired ATF Explosives Enforcement Officer, and expert in improvised incendiaries, explosives, and their associated devices concluded upon review of the relevant communications in this case and Mr. Smith's background that "Mr. Smith has no actual experience making explosives or incendiaries, nor any actual experience assembling incendiary or explosive devices or weapons of mass destruction."[58] Rather, Mr. Taylor has dissected for the Court Mr. Smith's communications, one by one, to dispel any doubt that Mr. Smith did not have even the "rudimentary knowledge," skill, or experience to understand the information about explosives that he was trying to convey to others. Mr. Smith, quite simply, was regurgitating information—and often incorrect information—that he had read online.[59]

While we do not intend to diminish the criminal offenses to which Mr. Smith has pleaded guilty and for which he quickly accepted responsibility, the nature and circumstances underlying Mr. Smith's actions, as well Mr. Smith's individual characteristics, are certainly relevant to the Court's sentencing analysis and provide just reason for a variance in this case.

---

[58] Report of Jerry Taylor (April 30, 2020) (**Def. Ex. 515**).

[59] Indeed, Mr. Smith admitted in an interview with the FBI that in the communications of interest, he had used the internet to research how to make explosive devices and then tried to communicate what he had learned to others.

***The retributive and deterrent effect of this prosecution and Mr. Smith's incarceration.***

As part of Court's sentencing obligations, it must also consider the need for the sentence imposed to "provide just punishment for the offense."[60] Relevant here is the fact that Mr. Smith's prosecution has made national headlines. He has been publically humiliated, and tagged as a Satanist Solider. He has been involuntarily discharged from the Army as a result of pleading guilty to these charges. And he will be forever prohibited from owning a firearm. When Mr. Smith returns home to South Carolina, he will not only be subject to prohibitive conditions and internet monitoring for three years, he will also be subject to the public's scrutiny.

The global pandemic, too, necessarily alters the sentencing calculation with regard to just punishment. As a result of the global COVID-19 pandemic and the increased risk of infectious diseases spreading rapidly through institutional settings, BOP has modified its operations.[61] Family and friends are prohibited from visiting.[62] Each of these considerations are relevant to the determination of a sufficient-but-no-greater-than-necessary sentence in this case given that any additional incarceration that Mr. Smith is ordered to serve will necessarily be more severe under the circumstances than it otherwise would have been if not during a global pandemic.

---

[60] 18 U.S.C. § 3553(a)(2)(A).

[61] USDOJ BOP, *Coronavirus (COVID-19) Phase Nine Action Plan* (discussing modified operations that have been continually extended since March 13, 2020), *available at* https://prisonology.com/wp-content/uploads/2020/08/COVID-19-Phase-9-COVID-Action-Plan.pdf.

[62] *See* BOP, *BOP Implementing Modified Operations* (noting that "[s]ocial visits are suspended"), *available at* https://www.bop.gov/coronavirus/covid19_status.jsp

Before this prosecution, Mr. Smith had never been arrested, let alone held in a custodial setting. The time that Mr. Smith has already served in custody at CoreCivic in Leavenworth, Kansas—far from his family in South Carolina—has already had a significant impact on Mr. Smith.

### *The public's interest in Mr. Smith's continued rehabilitation and successful reentry into the community*

Mr. Smith is fortunate that he has a stalwart network of individuals whom will provide a strong, supportive environment upon Mr. Smith's release from custody. When he returns home to South Carolina, the Court can have full confidence that his support network will help him successfully integrate back into the community.

Mr. Smith's family loves him and is ready for him to come home. They are also willing to provide whatever support is necessary to ensure that Mr. Smith lives a law-abiding life going forward. Mr. Smith already has an employment opportunity secured at his family's church.[63] And two Pastors who have been long-time family friends of Mr. Smith's family have also offered counseling to him upon his return.[64]



---

[63] Letter of Chris Smith (**Def. Ex. 506**).

[64] *See* Letter of Pastor Al Philley (**Def. Ex. 511**); *see also infra* Discussion of correspondence with Pastor Edmond Daniel.

What sheds further light on Mr. Smith's likelihood of success upon release, however, is Mr. Smith's personal acknowledgments and conduct over the past eleven months while in custody. Mr. Smith has accepted responsibility. He acknowledges that he needs help to treat a deep-seated depression that has remained unresolved for far too long. He also acknowledges that he was self-medicating his depression with alcohol, which he does not want to do going forward. (Notably, Mr. Smith is staunchly against drugs, and aside from using marijuana one time at the age of 13, he has never used a controlled substance since.[65]) He has obtained employment while in custody, working to wipe down tables and clean the day room.

And it was Mr. Smith, in fact, who initiated the idea of seeking additional counseling with Pastor Edmond Daniel. Pastor Daniel officiated the marriage ceremony for Mr. Smith's mother and stepfather in 2006. As shown in the photograph on page seven of this memorandum, Pastor Daniel is African American. Mr. Smith recognizes that he has harbored terrible beliefs towards people who are different than based on their race. Mr. Smith wishes to squarely confront these thoughts from his past with someone with whom he knows and trusts, and who is African American. Pastor Daniel, who has known Mr. Smith's family for about thirty years as friends and colleagues, and who is aware of this case and the charges to which Mr. Smith has pleaded guilty, has stated that he is "happy to accommodate [Mr. Smith]'s wishes" in speaking with him upon Mr. Smith's return home, noting that Mr. Smith has "always

---

[65] *See* D.E. 23 (PSR) at ¶91.

been warm and respectful[,]" has "always received me with caring and kindness[,]" and that he believes despite this conduct, Mr. Smith "is a good young man with a productive future."[66]

Lastly, language that Mr. Smith recently used in a letter to Leo, his eleven-year-old cousin who has Autism Spectrum Disorder, ADHD, OCD and Generalized Anxiety Disorder, provides even further demonstrative evidence of the deterrent effect this prosecution has had on Mr. Smith, and of Mr. Smith's ongoing rehabilitation. Mr. Smith's Aunt (Leo's mother) writes,

> I have been so impressed with Jarrett's commitment to writing Leo and offering words of support and guidance to him. A recent excerpt from Jarrett's most recent letter to Leo addresses how he treats people in jail. Leo was worried about [Jarrett's] safety and had asked how he stays safe. Here is an excerpt of Jarrett's response, "I am not in a gang. I am respectful to everyone…always try to learn more than you knew before. Stay away from drugs, alcohol, and drama…make sure you follow the law. Then you won't need [to] worry about jail." . . . . My son needs people in his life that accept him as he is, without judgment. I feel very blessed that he has Jarrett.

Mr. Smith has in the course of this prosecution reached the nadir of his life. But his conduct since his arrest, his solid release plan, and the caring support-network upon which he has to lean once released should assure this Court of Mr. Smith's desire and ability to lead a law-abiding life moving forward.

## 3. Conclusion

For the reasons set forth in this memorandum and supporting documents, as well as those set forth at the sentencing hearing, we respectfully ask the Court to find that

---

[66] Correspondence between Pastor Ed Daniel and counsel (July 15, 2020).

a sentence of imprisonment of 15 months followed by three years of supervised release is a sentence sufficient but no greater than necessary to accomplish the purposes of sentencing set forth by Congress.

Respectfully submitted,

s/ Rich Federico
Rich Federico, #22111
Assistant Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Email: rich_federico@fd.org

s/ Kathryn D. Stevenson
Kathryn Stevenson, #27120
Assistant Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Email: katie_stevenson@fd.org

## Certificate of Service

I hereby certify that on August 12, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/ Rich Federico
Rich Federico, #22111

s/ Kathryn Stevenson
Kathryn Stevenson, #27120