# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**
               Plaintiff,

      **v.**                                                 Case No. **1083 5:19CR40091-001**

**JARRETT WILLIAM SMITH,**
               Defendant.

---

## UNOPPOSED MOTION FOR EARLY TERMINATION
## OF SUPERVISED RELEASE

---

Under 18 U.S.C. § 3583(e)(1), Mr. Smith moves the Court for an order terminating his term of supervised release. He has completed 18 months of his 36-month term. Mr. Smith's post-sentencing conduct demonstrates both a willingness and capability to remain a valuable, law-abiding member of the community. As Mr. Smith's reintegration into society is complete, it is not necessary for U.S. Probation to continue expending resources to supervise a rehabilitated man. Neither the Office of Probation and Pretrial Services, by U.S. Probation Officer Krista Robertson, nor the government, by First Assistant U.S. Attorney Duston Slinkard, oppose Mr. Smith's present request.

### 1. Procedural background of Mr. Smith's case[1]

On February 10, 2020, Mr. Smith pleaded guilty to one count of distributing information related to explosives under 18 U.S.C. § 842(p). Doc. 21. On August 24, 2023, the Court sentenced him to 30 months imprisonment and a 3-year term of supervised release. Doc. 31. While in custody of the Bureau of Prisons, Mr. Smith completed a drug and alcohol awareness

---

[1] The following abbreviations are used herein: "Doc." references documents filed on the CM-ECF docket.

class and a professional cooking skills before his release in 2021.

## 2. Mr. Smith's progress on supervision

Eighteen months ago, Mr. Smith began his term of supervised release on November 5, 2021 in Conway, South Carolina. As verified by Probation Officer Krista Robertson, Mr. Smith is in good standing with the U.S. Probation Office. When asked to provide a report of Mr. Smith's time on supervision, Ms. Robertson provided the following information to defense counsel:

> In July of 2022, I conducted a home contact and found that Mr. Smith was in possession of a phone with internet capabilities via Wi-Fi. The phone was an old flip phone; however, it was still able to access the internet. Mr. Smith seemed genuinely surprised the phone had internet capabilities. He gave me permission to search the device, and no evidence was found to suggest the device had been used to access the internet. He has since purchased phone that is talk and text only. The Court was notified of the violation, and it was held in abeyance.

> Other than the above violation, Mr. Smith appears to be in compliance with his conditions of supervision. He has maintained a stable residence and employment. Additionally, he has been attending and participating in treatment. To date, all drug tests have yielded negative results. Illegal drug use or alcohol use is not suspected. Given his overall compliance with treatment and supervision, I have no objections to his early termination request.

It is a condition of Mr. Smith's supervision that he attend counseling through Agape Counseling. Mr. Smith's Agape counselor, Tim Underwood, does not oppose Mr. Smith's early termination from supervision.

### 3.  Legal Framework

The Court has broad authority to terminate a term of supervised release under 18 U.S.C. § 3583(e)(1). The only statutory requirement for termination is that the defendant has served at least one year of supervised release. 18 U.S.C. § 3583(e)(1). If that requirement is met, the statute provides for termination if the Court "is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." *Id.*

In determining whether to grant early termination of supervision, the statute instructs courts to consider some of the statutory sentencing factors listed at 18 U.S.C. § 3553(e). Id.; see also *Rhodes v. Judiscak*, 676 F.3d 931, 935 (10th Cir. 2012). Those factors include the nature and circumstances of the offense and the history characteristics of the defendant; adequate deterrence; protection of the public; the need for effective education, training, care or treatment; the sentencing guideline factors and range in effect at the time of sentencing; pertinent Sentencing Commission policy statements; the need to avoid unwarranted sentencing disparities between similarly situated defendants; and the need to provide victim restitution. 18 U.S.C. § 3583(e) (citing 18 U.S.C. § 3553(a) factors).

Section 3553(a) factors a reviewing court may *not* consider are "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, [] to provide just punishment for the offense[,]" and "the kinds of sentences available." 18 U.S.C. § 3583(e). This is because supervised release "serves an entirely different purpose than the sentence imposed under § 3553(a)." *Pepper v. United States*, 562 U.S. 476, 502 n.15 (2011). As the Supreme Court has stated, "Congress intended supervised release to assist individuals in their transition to community life." *Johnson v. United States*, 529 U.S. 694, 708-09 (2000) (discussing the congressional "aim[] . . . to use the district court's discretionary judgment to allocate

3

supervision to those releasees who need[] it most.").

### 4. Request for Termination of Supervision

Termination of supervision is warranted in this case based on "the conduct of [Mr. Smith] and the interest of justice." *See* 18 U.S.C. § 3583(e)(1). Mr. Smith has had one instance of possible violation conduct while on supervision, and the circumstances of that violation as explained by his U.S. Probation Officer indicate that the conduct was not knowing. In July 2020, Mr. Smith was found in possession of "an old flip phone," which Ms. Robertson determined could be connected to the internet through Wi-Fi. When Ms. Robertson told Mr. Smith of her finding, he appeared "genuinely surprised the phone had internet capabilities." Mr. Smith immediately consented to a search of the phone, which as stated above, did not reveal any evidence that the phone had ever been connected to the internet. He then purchased a phone with only talk and text capabilities. Beyond this single instance, Mr. Smith has maintained total compliance with the terms of his supervision. He has maintained a stable residence and employment, positively engaged with treatment, and consistently tested negative for controlled substances.

The considerations outlined in 18 U.S.C. § 3553(a) strongly support early termination of Mr. Smith's supervised release, beginning first with the consideration of Mr. Smith's history and characteristics as detailed at length in Defendant's Sentencing Memorandum, Doc. 28, filed in August 2020.

### A. 18 USC § 3553(a)(1) – Mr. Smith's History and Characteristics

Mr. Smith was born in September 1995 to part-time musician parents Chris and Rebecca. He was born with a bilateral cleft lip and palate—birth defects with unknown causes—which required "repeated, invasive, and painful reconstructive surgeries from early infancy throughout his teenage years." Doc. 28 (Sentencing Memorandum) at 2. Six years into the reconstructive surgeries, Chris and Rebecca welcomed a second child. Jillian Smith was born with a missing chromosome and a congenital heart defect that culminated in emergency, open-heart surgery at 6 months old. A tumultuous couple years passed before Chris and Rebecca ultimately split, leaving Jarrett to navigate the hurdles of middle school without a solid home base to return to.



*Jarrett meeting baby sister, 2001*

The typical hurdles of middle school were significantly exacerbated for Mr. Smith, who bore the scars of ongoing reconstructive surgeries for his cleft lip. And physical appearance aside, Mr. Smith was also relentlessly bullied for a related speech impediment, fiery red hair, and the divorce of his parents. By 2010, the verbal bullying had intensified to the point that Mr. Smith's peers routinely told him things like "why don't you kill yourself," and "no one likes you." Doc. 23 (PSR) at ¶ 84. Physical assaults were also not uncommon for Mr. Smith in his teenage years, who recalls "peers throwing rocks at him, ambushing him at the bus stop, and inviting him over to their homes only to physically attack him upon his arrival." Doc. 28 (Sentencing Memorandum) at 6.  The victimization and peer rejection culminated into predictable emotional

and behavioral issues that drove Mr. Smith to self-isolate.[2]



*Jarrett in 2011*

In September 2010, as a freshman at Socastee High School, Mr. Smith experienced the unthinkable. A 14-year-old classmate arrived at Socastee with a loaded gun, multiple pipe bombs, and a list of thirteen targets.[3] Jarrett Smith was one of the intended thirteen. He learned later that his classmate had written, "People would thank me for killing him." *See* Doc. 28 (Sentencing Memorandum) at 8. Once inside Socastee, the classmate fired a shot before a fast-acting school resource officer wrestled him to the ground. The classmate was apprehended and ultimately pleaded guilty to attempted murder. His 6-year prison sentence did little to address Mr. Smith's culminating emotional traumas, and Mr. Smith recounted at the time being disappointed with his classmate's prison sentence.

Fast forward to this year, when Mr. Smith received a questionnaire from the South Carolina Department of Probation, Parole and Pardon Services. The questionnaire asked Mr. Smith how he would feel if his former classmate, the Socastee school shooter, were granted a pardon. Mr. Smith's family did not believe that he would respond to the questionnaire, given the significant stress and trauma that Jarrett carried relating to the September 2010 incident. Mr. Smith surprised them, however, when he checked the box stating that he, as a target and a victim, did

---

[2] Prolonged bullying by one's peers is linked to increases depression, suicide ideation, self-harm, and compromise social development. Randy A. Sansone. Lori A. Sansone, *Bully Victims: Psychological and Somatic Aftermaths*, PSYCHIATRY: THE INTERFACE (June 2008) (discussing the psychological and somatic symptoms correlated to youth who bear frequent bullying), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2695751/pdf/PE_5_6_62.pdf.

[3] Nicholas Papantonis, *Soldier suspected of bomb plot once on classmate's 'hit list' in high school*, ABC 15 News (Sept. 24, 2019), available at https://wpde.com/news/abc15-investigates/soldier-suspected-of-bomb-plot-once-on-classmates-hit-list-in-high-school.

not oppose his former classmate's pardon. According to Mr. Smith, his former classmate served his time—both in prison and on supervision—and he deserved a chance to rebuild his life.

Mr. Smith's history of victimization, peer rejection, and depression serve to highlight the positive qualities of the man Mr. Smith is today: hard working, family-oriented, dependable, and motivated. Since his release from prison, Mr. Smith has remained consistently employed—most recently as a line cook at World of Beer. *See* Attachment 5 (General Manager Letter of Support). Mr. Smith's aunt, Michelle Gisondi, describes for the Court the pride that her nephew takes in his work. *See* Attachment 1 (Michelle Gisondi's Letter of Support) ("The experience he is receiving is applicable to his goal of starting a catering business with his friend, who is also a cook.").

Outside of work, Mr. Smith spends time with his family and his coworkers. Mr. Smith's mother, Rebecca Bongiorno, writes,

> I am especially happy that he has been working at the restaurant he is at, for quite some time. He was honest and open with them from the start, about his former legal issues during his initial interview for the position…They invite my son to attend outside functions like birthday parties and fun events, and he looks forward to going. He is accepted and appreciated there.[4]

He also plays the guitar, sings, and writes original music for his band. *See* Attachment1 (Michelle Gisondi's Letter of Support). When he's not with coworkers or his band, Mr. Smith spends time with his little sister Jillian. Together, they play video games and watch movies. Jillian, who is disabled, writes that Jarrett "has softened" since his release from prison; his presence is a stress relief to Jillian and Rebecca alike. *See* Attachment 3 (Jillian Smith's Letter of

---

[4] See Attachment 2 (Rebecca Bongiorno's Letter of Support).

Support).

**B.  18 USC § 3553(a)(2)(B), (C) – Adequate Deterrence and Protection of the Public**

First, Mr. Smith is a man who presents no danger to the community. 18 U.S.C. §

3553(a)(2)(C). He has significant family support, as demonstrated by the letters of his mother,

father, sister, and aunt.[5] He has adjusted socially in Myrtle Beach, Virginia and has begun

planning for his future in that area. Mr. Smith has been free from any moderate or high severity

violations while on supervision, as confirmed by his U.S. Probation Officer. He has not used

illegal drugs, missed therapy appointments, let his employment lapse, or otherwise violated any

conditions. The purpose of supervision— "to assist individuals in their transition to community

life"—has been served. *Johnson v. United States*, 529 U.S. 694, 708-09 (2000) (discussing the

congressional "aim[] . . . to use the district court's discretionary judgment to allocate supervision

to those releasees who need[] it most."). The community does not require protecting from Mr.

Smith as he poses no danger.

Second, the sentencing goal of deterrence under 18 U.S.C. § 3553(a)(2)(B) is also served by

Mr. Smith receiving the positive incentive of early termination of supervision. If the Court

allows Mr. Smith to earn early discharge of supervision, it serves as an example for others to do

the same. This positive incentive can serve the goal of deterrence under 18 U.S.C. §

3553(a)(2)(B).

Early termination of Mr. Smith's supervised release poses no danger to public safety and is in

the interest of justice. The Office of Probation and Pretrial Services has conducted a study of

early termination of supervision to see if such termination promotes the goals of providing a

---

[5] Attachments 1-4.

"positive incentive for persons under supervision and as a measure to contain costs . . . without compromising the mission of public safety." Laura M. Baber and James L. Johnson, *Early Termination of Supervision: No Compromise to Community Safety*, Federal Probation, Sept. 2013, at 17.

Early termination of supervision will allow Mr. Smith to freely visit out-of-state family members. Research from the Office of Probation and Pretrial Services suggests that a connection with family is more helpful with preventing recidivism than the continued threat of prison. *See* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?*, Federal Probation, Vol. 80, No. 3, at 37 (Dec. 2016) ("[T]he empirical evidence points to non-legal factors, such as marriage, employment, peers, morality, disapproval from loved ones, ostracism, and shame, having a more significant impact on conformity than do sanction threats[.]" ) (citation omitted). Mr. Smith's steady employment and positive exercises of personal development can assure the Court that his success will continue once supervision is terminated.

Based on Mr. Smith's performance and in the interest of justice, the Court should grant early termination of his supervision under 18 U.S.C. § 3583(e)(1).

**5. Conclusion**

For these reasons, Jarrett Smith asks this Court to terminate his term of supervised release under 18 U.S.C. § 3583(e)(1).

Respectfully submitted,

s/ Hunter Lindquist
Hunter Lindquist, #28937
Assistant Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886

Email: hunter_lindquist@fd.org

**Certificate of Service**

I hereby certify that on May 30, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all interested parties.

s/ Hunter Lindquist
Hunter Lindquist, #28937

**ATTACHMENT 1**

May 7, 2023

Dear Honorable Judge of the District Court:

I am writing to you regarding Jarrett William Smith's probation sentence. My name is Michelle Gisondi and Jarrett is my nephew.  We have been in consistent contact during his prison sentence and subsequent release. I have had several conversations with Jarrett regarding his current life and future aspirations.

Jarrett has remained consistently employed since his release. It is true some jobs were not a good fit, but he always found another position quickly. He seems to really enjoy his current job as a line cook at World of Beer. He takes pride in his work as he has mentioned several dishes that he likes to prepare. The experience he is receiving is applicable to his goal of starting a catering business with his friend, who is also a cook. Jarrett seems to be thriving at his job.

I have personally employed Jarrett to help with our rental properties in Myrtle Beach, as we live in North Carolina. He has been responsive and done what I have asked with no problems. It is very comforting to us that Jarrett is near our properties in case of an emergency.

Another goal I have heard Jarrett speak of is getting his own apartment. I believe he is grateful for his Dad supplying him a place to live, but he does want to be living as an independent adult, responsible for his own bills and housing. He has been working hard and saving money to put toward an apartment.

Jarrett has also spoken to me about his band. He plays guitar, sings and writes original music. This is great social interaction, fun and a much needed creative outlet which balances out his work life.

Jarrett has mentioned in many conversations his desire to learn. He wants to soak up new information, read books on his interests and improve his physical health. I think his time in the Army made him into a man who wants to experience life fully and with purpose. I have been impressed with his desire to make a difference in the world.

It is for the above reasons that I believe Jarrett to be a contributing member of society, ready to take on more responsibility and independence.

Thank you for your time.

Sincerely,

Michelle Gisondi

**ATTACHMENT 2**

March 23, 2023

To: The Honorable Judge of the District Court

I am Rebecca Bongiorno. I am the Mother of Jarrett William Smith and I am self-employed as an independent contractor. I have been in business for myself since before he was born, and I still am.

I'd like to state the following positive aspects that I have observed about my son since he has returned home.

To begin, Jarrett was a wanted baby and very much planned. He was born at full term and was also our first child. He grew up living with both his Dad and I. We raised him up as a Christian, belonging to a Christian church, along with his younger sister, Jillian. He has had a positive influence from the household since he was born.

I am very proud of my son. He (and his sister) are clean-living citizens. Jarrett does not drink, do recreational drugs, or have problems with girl friends, like the problems most other parents have with their adult children. He likes to be social and has been able to rekindle several friendships he had before leaving for the Army and later, serving his time. They love and trust him as they did before. I am so happy about that. His friends and family know him deep down, and that he is so full of love in his heart for his own family, friends, and especially for those who are in hardship. More than anything, he wants to help those in need, even if it means risking his own safety. To be able to possess such an unconditional love for people he doesn't even know personally, is rare.

I thank God that he has the support of his friends from way back in high school, and his family also to help him feel loved and cared about. As his mother, it is easy for me to do that, so when I see that his friends want to spend time with him, and I hear them call him to chat, I know that he has the the support he needs outside of the family. The media did their best to paint a negative, evil picture of Jarrett, but as always, the real truth will prevail in time. It already has.

Jarrett has discussed the details of his legal problems with us (his parents and family). We talk about it a lot. It is hard to forget the past as if it were never there, but we do try to look more into the future. Again, we try to focus on positive aspects and having a healthy re-establishment into society. (I say "we" because as a family, we all hope to never have to go through this type of legal issue again.) I think he has managed very well since he's been back home.

I am especially happy that he has been working at the restaurant he is at, for quite some time. He was honest and open with them from the start, about his former legal issues during his initial interview for the position (in case people brought up his case at work). They are most understanding about it and enjoy

having him there, as he makes the workplace fun with his sense of humor. I visited the restaurant and as the staff realized I was his mother, they went out of their way to welcome me. One of the waitresses pulled me aside to tell me that Jarrett was her favorite person there!! That says a lot, since her boyfriend works there also and SHOULD be her favorite. They invite my son to attend outside functions like birthday parties and fun events, and he looks forward to going. He is accepted and appreciated there. All of this just touches my heart.

Jarrett has always been a good, hard worker. I remember the first job he had as a teenager, back in high school. He had to get up at 4am on the weekends to go in. He never once complained about that. There was a time when he became sick with a stomach flu but went to work anyway because he was just that dedicated!! He did not ask to go home, but when the company realized he was that ill, they strongly suggested that he go home to rest and come back when he was better in a few days.

This past Christmas, I had Covid. I was too sick to prepare all the food, decorations, presents, etc. Once I tested negative and it was safe for my family to be around me again, (I was still feeling badly), Jarrett showed up, playing Santa, with bags of gifts for everyone! And even multiple gifts for each of us. It just touched my heart that he had gone out shopping while I was sick and spent his own money to make sure that Christmas was not going to be cancelled, but instead, that Christmas was going to be merry for all of us after all!! This is just one example of the good heartedness that my son carries. I will never forget how my son saved Christmas 2022!!

I'd like to add that we have a family night once a week. We have a nice home cooked meal, great discussions at the table, watch movies or play games. Jarrett always reserves that time to be there. He's never missed one yet. He's a good son and keeps me up on his day to day (sometimes, hour to hour) activity details and lets me know that he got home okay if he stayed at my house late.

Only one time, in January this year, he was a little late coming over, to find that he had rescued a dog running loose on the road and took it to the address on it's collar. A small child and Mom answered the door. The child burst into tears of joy that his dog had been returned safely. My son was a great hero!

Jarrett was at a game store to pick up a new game that came out. There was only one left and he got it. As he was standing in line to pay, he overheard a father and young boy's disappointment when they discovered that the game they came for (the one Jarrett had) was sold out. Well, my big-hearted son stepped out of the cashier line and handed his game to the boy. The happiness the boy expressed caught the attention of an employee, who went in the back and discovered there was one extra game left and gave it to Jarrett since he had been so sweet to give the boy his. This is a good example of who my son really is. If you knew him deep down, in his heart and soul, the way his family and close

friends know him, you would certainly agree.

Also, Jarrett gave me Power of Attorney while he was serving time. I still watch over his accounts some so I can help him by monitoring his financial affairs. He does not spend his money frivolously. I only see gas, some food, car insurance and car payments on the transaction record of the one account I can access. He has since opened a separate account of his own other living expenses and a few payments. I do know that he tries to save as much as he can. He's always been highly intelligent in a lot of areas, both academically and all-around. I am glad I can put my faith and trust in him as being a well-rounded good citizen.

He aspires to become a husband and father at some point. He is very traditional and would hope to find a nice lady the same way. I have no doubt that he will be a faithful husband and a wonderful Dad to my future grandchildren.

I am extremely grateful that my son has been home the last year or so, thanks to God and everyone who believed in him enough to make it happen. He has served his time and deserves to move on with his life.

Thank you for your time and help with this matter.


Respectfully,

Rebecca Bongiorno

**ATTACHMENT 3**

April 15, 2023

To: The Honorable Judge of the District Court
From: Jillian Smith, sister of Jarrett W. Smith

Dear Judge,

Jarrett has calmed down a lot since he got home. My Mom and I have been a lot happier after his release. He seems to be getting back into the civilian life. Having him home has been a great stress reliever and it has helped my depression go down a lot. As said above, Jarrett has softened.

Since he's been home, he's done great things. Jarrett loves his new job and the people that he works with over there, and that makes me really happy for him! I want him to feel like he can be around other people like before. As it goes for me and Jarrett, we've been spending a ton of time together which I had deeply missed. We've been playing video games some, watching movies, going places, and just over all having fun with things that we haven't gotten to do in such a long time. Jarrett has also done good things for others. He helped some people that live a few miles away by bringing back their lost dog, who couldn't find his way back home. The dog trusted him and got into his car while Jarrett took the dog back to its owners. It was a really sweet thing of him to do.

Yes Jarrett does have a very sweet side to him. He's helped me with a lot of things in the past, like helping me with schoolwork when I was sick. He's very smart and great at history. You can learn a lot from him if you ask him a question about a certain topic.

He treated me by taking me to Dave & Buster's and we had an awesome time there! They have great games and great food there too! We both had fun playing video games together there and that is something he and I have done since we were children. He paid for everything. I always have a blast whenever we do gaming! It puts a smile on my face because it brings back childhood memories when times were better and now we're ready to make new memories. We also spend time with him every Thursday (family night) it's always fun having him come over.

Having him home has really helped me and my Mom more than you know. We feel like we can be a family again by having him here with us. We're so thankful to have him back home. We're looking forward to doing many other things with him. I'm very much looking forward to spending more time with him this year. I really can't wait, with many more memories to come!

Sincerely,

Jillian T. Smith

**ATACHMENT 4**

**From:**      Chris Smith
**To:**        Hunter Lindquist
**Subject:**   Early probation release for Jarrett Smith
**Date:**      Monday, April 17, 2023 1:07:10 PM

To the Honorable Judge of the District Court:

My name is Christopher Lanier Smith and I am the father of Jarrett William Smith. I am writing in regard to having Jarrett realeased from supervised probation early. Jarrett has certainly made a change for the better in his life since his release from prison. He has been gainfully employed for nearly a year and is a valued member of the kitchen staff at the World of Beer restaurant. He is a hard and versatile worker, and handles his money wisely and well. He has a loving family that supports him and wants to see him succeed in life. Both parents are involved in his life and he spends time helping with his special needs sister as well. We support his ambitions, he has the goal of opening his own catering business here in Myrtle Beach. He is a sober minded individual, wanting to move ahead to fulfill his dreams and ambitions. He doesn't spend his money or time pursuing frivolous activities, he has saved a considerable amount to start his new business. Jarrett has followed all the terms of his probation and has not committed any infractions. I have heard his probation officer tell him "You are doing just fine, I have no problems with you. I have some with a lot of the people I supervise but not with you". He has not failed any tests for drugs or alcohol nor been in trouble with law enforcement. Jarrett has been a fine example of how someone should conduct himself while on probation. He has done all asked of him and kept out of trouble. While he has not exhibited the best judgment in the past, his family stands ready to help support him as he moves forward with his life. It is my sincere hope that Your Honor will see a way forward to grant this for him to continue this move forward. Thank you for taking the time to view this. Sincerely Christopher L. Smith.

**ATTACHMENT 5**



To whom it may concern,

This letter is to verify that Jarrett Smith is employed by World of Beer. Jarrett or Will as we call him has worked here since July 2022. During his time here he has always been a model employee, treating staff and guests with respect. He is always asking for tasks to complete and does his work in a timely manner. He is an employee who I as a general manager would wish for more.

If you have any questions at all please feel free to contact me.


Thank you-

Brian Cowles
Managing Partner
World of Beer North Myrtle Beach
1386 HWY 17 N
North Myrtle Beach, SC 29582
Brian.cowles@worldofbeer.com